(No. 83385.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES WOODS, Appellant.

*Opinion filed September 24, 1998.—Rehearing denied November 30, 1998.*

G. Joseph Weller, Deputy Defender, and Kathleen J. Hamill, Assistant Defender, of the Office of the State Appellate Defender, of Elgin, for appellant.

James E. Ryan, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Barbara A. Preiner, Solicitor General, and William L. Browers and Bridget L. Field, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, James Woods, sustained injuries while in police custody. Defendant contends that he was physically and psychologically coerced into confessing to the crimes with which he was charged. In denying defendant's motion to suppress his confession, the trial court found that the State had presented clear and convincing evidence, in accordance with this court's decision in *People v. Wilson*, 116 Ill. 2d 29 (1987), that the injuries sustained by defendant were not inflicted by police as a means of producing the confession. Defendant was subsequently convicted and sentenced to two concurrent terms of natural life in prison. With one justice dissenting, the appellate court (No. 2—94—1393 (unpublished opinion under Supreme Court Rule 23)) affirmed the trial court's denial of defendant's motion to suppress.

The sole issue presented in this appeal is whether, because defendant was admittedly injured while in police custody, the State established by clear and convincing evidence that the injuries were not inflicted as a means of procuring defendant's confession. We now reverse and remand this cause for a new trial.

## BACKGROUND

Defendant and a codefendant, Aldwin McNeal, were charged in a single indictment with armed robbery and double murder committed at Maude's Pizza restaurant in Waukegan, Illinois, on April 7, 1994. Defendant, who was charged with two counts of first degree murder in violation of section 9—1(a)(3) of the Criminal Code of

1961 (720 ILCS 5/9—1(a)(3) (West 1994)) and two counts of armed robbery in violation of section 18—2(a) of the Code (720 ILCS 5/18—2(a) (West 1994)), was prosecuted separately from McNeal. At trial, the State introduced defendant's confession concerning his involvement in the armed robbery and murders. The jury found defendant guilty and the court sentenced him to natural life in prison for the murder convictions. No sentence or order of final judgment was entered on the armed robbery convictions.

Prior to trial, defendant filed a motion to suppress his confession, alleging that his inculpatory statement was a direct result of verbal threats and physical coercion by Waukegan police officers. The trial court conducted a hearing on defendant's motion, adducing testimony from numerous witnesses concerning the circumstances surrounding defendant's arrest and confession on April 23, 1994.

According to the testimony, on April 21, 1994, the Zion police department obtained a warrant for the arrest of McNeal in connection with an unrelated incident which occurred prior to the Maude's Pizza robbery and homicides. The testimony indicated that officers from the Zion and Waukegan police departments frequently shared information. Upon being informed by the Zion officers that the arrest of McNeal was imminent, the Waukegan officers, who considered McNeal a suspect in the Maude's Pizza murders, accompanied the Zion officers in serving the arrest warrant. On April 22, 1994, between 10 and 15 officers from the Zion and Waukegan police departments went to McNeal's Zion residence to serve the Zion arrest warrant.

When the officers arrived at McNeal's home, they knocked on the door, and, after several minutes, defendant answered the door and stated that McNeal was not present. Defendant allowed the officers into McNeal's

residence, whereupon they conducted an unsuccessful search for McNeal. The officers testified that during the time that the search for McNeal was conducted, defendant was seated on one of the couches in the living room, drinking from a bottle of beer, and talking with two women and several children who were also present in the home. The officers testified that they had no knowledge of defendant prior to the time he opened McNeal's door, that he was not a suspect in any crime, and that defendant was free to walk around the living room during the officers' search of McNeal's residence. Waukegan Detective Richard Davis testified that while defendant was in the living room, Davis asked defendant to raise the sole of his sneaker shoe to see if the pattern was similar to a sneaker pattern left at the Maude's Pizza crime scene. Detective Davis testified that he believed the sole patterns of defendant's shoes were similar to the patterns left at the crime scene, and informed his superior officers of this belief. However, Davis stated that neither he nor anyone else suggested that defendant be taken into custody or arrested based upon the similarity of the sole patterns.

Waukegan Detectives Irvin Grimes and Artis Yancey testified that because they believed that defendant had information concerning the whereabouts of McNeal, they asked defendant if he would accompany them to the Waukegan police station. According to Detectives Grimes and Yancey, defendant agreed to go to the station and followed the officers out of McNeal's residence to Yancey's car. Defendant seated himself in the backseat while both Grimes and Yancey were seated in the front. Prior to entering the vehicle, defendant was neither searched nor handcuffed, and, according to the officers, defendant was not under arrest.

Detectives Grimes and Yancey testified that after they arrived at the Waukegan police station sometime after 8

p.m. on April 22, 1994, defendant followed them into an interview room and was presented with a form advising him of his *Miranda* rights. The form was read to defendant and defendant indicated orally and in writing that he understood his rights and that he voluntarily waived those rights. The detectives stated that Waukegan police department procedure requires that whenever anyone is questioned for any reason, that person must be advised of his or her rights and provided with the waiver of rights form. Grimes and Yancey testified that when defendant arrived at the Waukegan police station, defendant was neither under arrest nor a suspect, and was not photographed or fingerprinted at that time.

Detectives Grimes and Yancey proceeded to question defendant concerning the whereabouts of McNeal. However, Grimes admitted during cross-examination that the officers were also following up on the lead concerning defendant's shoes. According to Grimes and Yancey, during their initial questioning of defendant, which lasted approximately an hour, defendant maintained that he had no knowledge concerning McNeal or any crimes. Sometime after 9:30 p.m. Grimes and Yancey left defendant in the unlocked interview room to inquire of other detectives if there was any news concerning McNeal. Detective Yancey testified that during this break, Grimes advised him that defendant fit the description of a possible second offender at the Maude's Pizza murders. Upon their return to the interview room, the detectives focused their questions upon the Maude's Pizza incident, and defendant continued to deny that he knew anything about McNeal or the murders. According to the detectives, during this time defendant was not under arrest, defendant never asked to leave, and defendant did not request a lawyer.

Shortly before 12 a.m., Detective Donald Meadie came to the interview room and Detective Yancey went outside

to confer with him. According to Yancey, Meadie informed him that Aldwin McNeal's wife, Regina McNeal, had provided a statement implicating defendant in the Maude's Pizza robbery and homicide. Yancey asked Meadie to come into the interview room and inform defendant of Mrs. McNeal's statement. For the next hour defendant, confronted by Meadie, Grimes and Yancey, continued to deny any knowledge of the Maude's Pizza incident. Meadie then left the interview room to complete paperwork on Mrs. McNeal, while Detectives Grimes and Yancey continued to question defendant. According to Detective Yancey, defendant was first considered a suspect in the Maude's Pizza robbery and homicides only after Mrs. McNeal gave her statement implicating defendant. According to Grimes and Yancey, they terminated their questioning of defendant shortly before 2 a.m. on April 23, informed defendant that he was under arrest, and placed defendant in an individual cell located across from the interview room.

Grimes testified that he left the area after defendant was placed in the cell. Detective Yancey testified that he was alone with defendant, and, as he closed the door to defendant's cell, defendant was sitting on the bed. According to Yancey, defendant "looked very pitiful," causing Yancey to reopen the cell door and sit on the bed next to defendant. Yancey testified that he told defendant that McNeal "is going to drag you down on this." Defendant replied that defendant's life would be in danger if he spoke to the police because McNeal would arrange to have defendant killed in jail. Yancey testified that he told defendant that defendant "needed to tell a story" and that the police would protect him. In response, defendant began relating what had happened on the night of the Maude's Pizza homicides. At that point, Yancey left defendant's cell to inform his commanding officer that defendant was ready to confess to the Maude's Pizza robbery and murders.

Grimes and Yancey testified that they then removed defendant from the cell and returned him to the interview room. According to the detectives, at approximately 2 a.m. on April 23, defendant provided an oral statement implicating himself in the Maude's Pizza incident. The detectives then supplied defendant with a blank "voluntary statement" form, asked defendant to write out a handwritten statement in his own words, and left defendant alone to complete this task. Detective Yancey testified that during the time that defendant was writing out his statement, Yancey was preparing a typewritten statement based upon the oral account defendant had provided. The typewritten statement was then presented to defendant, who was asked to read it and make any corrections that he believed were necessary. Defendant made some changes to the typewritten statement and then signed both the handwritten and typewritten statements.

After these written statements were completed, the detectives provided defendant with a meal and discussed with defendant the possibility of making a videotaped statement. According to the detectives, defendant refused on the basis that a videotaped confession would be concrete evidence to McNeal that defendant had provided the police with information and that McNeal would certainly kill him. Although the detectives attempted to elicit information from defendant on videotape, defendant refused to provide any information and the detectives terminated the video session. Detective Yancey testified that he then booked defendant, and, as part of that process, took defendant's photograph. According to Yancey, the back of a booking photo usually reflects the time that photo is taken. However, Yancey admitted that the photo taken of defendant reflected only a date of April 23, and, due to an "oversight," the photograph did not the reflect the time at which it was taken. Yancey further testified that there is no other document which

indicates the time at which defendant was photographed.

The detectives testified that they accompanied defendant to court on April 25, 1994, and did not observe any facial injuries to defendant at that time. Detectives Grimes and Yancey testified that they never threatened or hit defendant, nor did they promise anything to defendant in exchange for defendant's making a statement.

Detective Donald Meadie of the Waukegan police department testified that he questioned Regina McNeal on April 22, 1994, and she provided an oral statement implicating defendant in the Maude's Pizza incident. Detective Meadie testified that he immediately conveyed Mrs. McNeal's statement to Detective Yancey, who, in turn, requested that Meadie speak to defendant. However, defendant continued to deny any involvement in the crime and, deciding that the effort to question defendant was futile, Meadie left the interview room. Detective Meadie testified that he never threatened defendant or used physical force against him, nor did he observe any injuries to defendant.

On cross-examination, Detective Meadie was presented with Mrs. McNeal's handwritten statement and admitted that there is no mention of defendant in that statement. Meadie explained that during her oral statement Mrs. McNeal clearly implicated defendant, and her handwritten statement was not prepared until after Meadie left the interview room to convey the information to Grimes and Yancey. Although Meadie acknowledged that Mrs. McNeal had left out many details in her handwritten statement, he noted that defendant was specifically mentioned in both a typewritten statement prepared by officers based upon Mrs. McNeal's oral account, as well as in Mrs. McNeal's subsequent videotaped statement.

The State also called Lake County Sheriff's Deputy Kenneth Knaus, who booked defendant at the Lake

County jail on the morning of April 25, 1994. Knaus testified that he took defendant's photograph as part of the jail's booking procedure. According to Knaus, he noticed no apparent injuries to defendant at that time, there was no blood on any of defendant's clothing, and defendant voiced no complaints to him.

Defendant testified concerning his version of events. According to defendant, he and McNeal were drinking beer at McNeal's residence when the police arrived. Defendant stated that McNeal hid in the attic before the police knocked on the door. Defendant testified that the police did not identify themselves when they knocked, and as he opened the door the officers rushed past him, guns drawn, and told him to "sit down and shut up." According to defendant, Detective Yancey asked defendant to display the bottom of his shoes, and, shortly thereafter, Yancey told defendant that he could either willingly accompany them to the station or that they could drag defendant out of the house. Defendant testified that he felt compelled to accompany the officers and he rode to the Waukegan police station in the backseat of Yancey's car, alongside Detective Grimes.

According to defendant, when they arrived at the Waukegan police station, he was taken to an interview room and was instructed by Yancey to take off his shoes and put them in the hall. Defendant stated that the detectives told him he was charged with murder, and that Grimes and Yancey then presented defendant with the waiver of rights form, which he signed. Defendant testified that Detective Yancey then took defendant's picture outside the interview room, and was thereafter placed in a cell. After approximately an hour, defendant was taken to an interview room, unhandcuffed, where Detectives Grimes and Yancey proceeded to question him concerning McNeal and the incident at Maude's Pizza. Defendant testified that Grimes and Yancey repeatedly

told him to "admit it" because they knew "he did it." Defendant stated that he informed Grimes and Yancey that he wanted to exercise his right to remain silent until he spoke to an attorney, and requested to make a phone call. According to defendant, Yancey told defendant that a phone call was a "privilege" and not a "right," and that defendant would not be allowed to use the phone until he spoke with them. Defendant testified that at one point during the questioning, Detective Meadie came into the interview room and joined Grimes and Yancey in asking defendant questions. According to defendant, when defendant did not answer their questions, he was returned to the holding cell until sometime early the next morning. Defendant was then removed from the cell, taken back to the interview room, and repeatedly asked by Grimes and Yancey if defendant was involved in the murders. According to defendant, although the detectives told him that Mrs. McNeal implicated him in the Maude's Pizza incident, when defendant read the written statement given by Mrs. McNeal, defendant discovered that he was not mentioned. As a result, defendant again refused to speak with Grimes and Yancey.

According to defendant, Grimes became angry and punched defendant in the mouth with his closed fist. Defendant related that Yancey grabbed defendant in the back of the neck and cut off defendant's breath. Defendant testified that he escaped from Yancey's hold when defendant fell to his knees because he had trouble breathing. Defendant stated that he laid down on the floor and tried to cover his body; however, Detective Grimes stood on defendant's left side and started jumping up and down on defendant's side and legs. Defendant testified that he rolled up into a ball and Yancey proceeded to punch him in the side of his head. According to defendant, Yancey sat on defendant and punched defendant in the face while Grimes continued to jump up and down on defendant's

side, repeatedly calling defendant a "murderous bastard." Defendant testified that Yancey then started kicking defendant in the face and again grabbed defendant by the neck, cutting off defendant's breath. Defendant testified that at that point he told the detectives that he would sign anything they wanted him to sign.

Defendant stated that the physical abuse inflicted upon him by Grimes and Yancey lasted in duration for a period of 15 minutes. According to defendant, the abuse was continuous, and defendant testified that Grimes and Yancey inflicted more than 100 blows to his body, head, and face. Defendant stated that Detective Meadie was present throughout the entire beating, although he did not threaten or hit defendant. Defendant stated that after this physical assault, the detectives resumed their questioning, and, upon his refusal to answer, he was returned to the holding cell. According to defendant, he was taken back to the interview room 15 minutes later, where Grimes pushed him down into a chair and stated, "We are going to kill you, you little murderous bastard." Defendant stated that Grimes and Yancey told him they were going to leave defendant's body on Waukegan's south side, arrest gang members for the killing, and label defendant's murder as gang-related. Defendant testified that he agreed to write out a statement at the direction of Grimes and Yancey because he was afraid the detectives would carry out their threats to kill him.

According to defendant, Grimes and Yancey provided defendant with a blank "voluntary statement" form, placed a typed statement next to it, and instructed defendant to hand-copy the typewritten statement to the blank form. After defendant completed this task, defendant stated that he was told to sign the form, which he at first refused to do. However, when Grimes started walking towards defendant in a threatening manner, defendant complied by signing all sheets. Defendant testified that

Grimes and Yancey then prepared a different typewritten statement and instructed defendant to correct various mistakes in that statement and initial the corrections. According to defendant, he was then returned to the cell. Defendant stated that as a result of the physical coercion he sustained a black eye, an abrasion on his head, and his back, side and neck were "hurting for awhile." Defendant testified that while at the Waukegan police station, the only individuals he came into contact with were Detectives Grimes, Yancey, and Meadie, and defendant was either in a single cell or in an interview room at all times.

After defendant was taken to court for a bond hearing on April 25, 1994, defendant was transported to the Lake County jail, where, during the booking procedure, defendant's photograph was taken. Defendant identified this photograph during the hearing and stated that a bruise and/or abrasion evident in the photo below his left eye was a result of being kicked in the face by Detective Yancey. Defendant further testified that an abrasion visible on the top right portion of his forehead was a carpet burn sustained when he tried to scoot away from Yancey's kicks. Defendant related that when he was seen by the jail nurse, he complained of severe pain in his jaw and informed her that he had been beaten by the police. On cross-examination, defendant admitted that he did not tell the judge at the bond hearing that the police beat him.

Defendant next called Sharon Workmant, a nurse at the Lake County jail, who interviewed defendant on April 25, 1994. Workmant testified that she noted that defendant had a black eye and an abrasion on his right upper forehead, and that he voiced complaints of a possible dislocated right jaw and of discomfort in his back, left hip, and the right side of his head. Workmant testified that she noted on the intake form that "Inmate states he

was beat up by police Saturday." On cross-examination, Workmant acknowledged that during this routine interview she only noted defendant's complaints and did not request defendant to remove his clothes in order to assess his injuries. Workmant further testified that although she felt defendant's jaw, she was unable to assess whether defendant was injured based upon her degree of medical certification.

Defendant's final witness was Lilia Ahmed, a correctional technician employed by the Lake County sheriff's department. Ahmed testified that when she interviewed defendant on April 25, she noted on her report that defendant displayed "facial injuries," and recalled that he had a black eye, abrasions, and scratches.

The trial court denied defendant's motion to suppress his confession. In response to defendant's allegation that the confession was the result of threats and physical abuse by police, the trial court relied on this court's decision in *People v. Wilson*, 116 Ill. 2d 29 (1987). The trial court judge determined that the two photographs of defendant established that defendant was injured while in police custody, and characterized the injuries sustained by defendant as an abrasion to his forehead and "a mark under his left eye." Because defendant was injured while in police custody, the trial court judge held that *Wilson* required the State to prove by clear and convincing evidence that defendant's injuries were not inflicted as a means of producing the confession. The trial court judge stated that although there "may be some dicta in *Wilson* that might be interpreted as requiring the State to prove how the defendant got his injuries besides just proving that the injuries weren't inflicted before the confession or to get the confession," the judge held that there was no rule of law requiring the State to provide such proof. The trial court judge ruled that although the State did not prove

how defendant sustained the injuries, the State nevertheless met its burden under *Wilson* because there was no corroboration for the additional injuries defendant alleged to have sustained to his side, back, neck or jaw.

The trial court judge found credible Detective Yancey's testimony that the first photograph showing defendant uninjured was taken on April 23, immediately after defendant had confessed. The trial court judge further found that the subsequent injuries suffered by defendant were inconsistent with the 15-minute nonstop beating defendant described, during which, according to defendant, more than 100 blows were inflicted to his head, face, and body. The trial court judge determined that defendant's testimony concerning the beating was not believable. The trial court judge additionally found that defendant's actions were not consistent with the beating defendant alleged, to the extent that defendant consumed a meal after the alleged beating, and that defendant refused to provide a videotaped statement, even though defendant testified that he suffered a beating every time he had refused to follow the detectives' instructions. The judge noted that although the quality of the videotape "isn't real good," defendant did not appear injured or to be in pain, and the videotape did not reveal blood, a disheveled appearance, or any obvious marks. Finally, the trial judge held that it was very unlikely that the police would order a meal for defendant and videotape defendant's appearance after beating him for a 15-minute period. Based upon the above findings of fact, the trial court judge held that the State established by clear and convincing evidence that defendant's facial injuries were incurred after defendant made the inculpatory statement and were not inflicted to coerce defendant's confession.

On appeal, a majority of the appellate court affirmed the ruling of the trial court in an unpublished Rule 23

order. The majority held that *Wilson* requires only that the State prove, by clear and convincing evidence, that the police did not inflict any injuries on defendant in order to produce his confession. According to the majority, the trial court properly denied defendant's motion to suppress his confession because the injuries sustained by defendant were not commensurate with the alleged severity of the beating, and, after observing the witnesses testify at the suppression hearing, the trial court was entitled to disbelieve the defendant's version of what transpired. In dissent, Justice Rathje wrote that because it was clear that defendant had suffered facial injuries while in police custody, *Wilson* required the State to present more than the officers' denials that defendant's confession was coerced. According to the dissent, the trial court failed to hold the State to its heightened evidentiary burden under *Wilson,* and incorrectly focused upon the credibility of defendant's account.

We granted defendant leave to appeal. 166 Ill. 2d R. 315.

### ANALYSIS

In his appeal to this court, defendant challenges the trial court's denial of the motion to suppress his confession. In order to determine whether the trial court erred, we address this court's decision in *People v. Wilson,* 116 Ill. 2d 29 (1987). We then review the trial court's application of *Wilson* to the facts in the instant cause.

In order for a confession to be admissible in evidence, the trial court must determine that the defendant made it freely, voluntarily, and without compulsion or inducement. *People v. Gilliam,* 172 Ill. 2d 484, 500 (1996). A confession is voluntary if, based upon the totality of circumstances, the accused's will was not overborne at the time he confessed; the confession must be the product of a rational intellect and a free will. *People v. Kincaid,* 87 Ill. 2d 107, 117 (1981).

When a defendant moves to suppress his confession, the State has the burden to establish by the preponderance of the evidence that the confession was voluntary. 725 ILCS 5/114—11(d) (West 1994); *Lego v. Twomey*, 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 626-27 (1972); *People v. Caballero*, 102 Ill. 2d 23, 33 (1984). On a hearing on a motion to suppress, it is the responsibility of the trial court to resolve conflicting evidence and determine the credibility of the witnesses. *People v. Redd*, 135 Ill. 2d 252, 289 (1990). If the sole evidence of coercion is defendant's testimony, and that testimony is contradicted by witnesses for the State, the trial court may choose to believe the prosecution's witnesses. The trial court is in the superior position to evaluate the credibility of the witnesses. *People v. La Frana*, 4 Ill. 2d 261, 267 (1954).

In *People v. Wilson*, 116 Ill. 2d 29 (1987), this court held that when it is evident that a defendant has been injured while in police custody, the State must satisfy a heightened burden of proof and establish by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. In *Wilson*, the defendant filed a motion to suppress his confession, alleging that police officers verbally and physically abused him in order to coerce his confession to the murder of two Chicago police officers. This court held that the heightened burden of proof "requires more than the mere denial by the State's witnesses that the confession was coerced." *Wilson*, 116 Ill. 2d at 40. Accordingly, "it was necessary for the State to show by clear and convincing evidence that the injuries did not occur before the defendant gave his confession." *Wilson*, 116 Ill. 2d at 41.

The *Wilson* court determined that the State had not met this heightened burden of proof in that case because "[a]lthough the State presented evidence that could account for when some of the defendant's facial injuries oc-

curred, the others were not explained, and with respect to those injuries the State essentially relied on a mere denial of coercion." *Wilson*, 116 Ill. 2d at 41. The *Wilson* court concluded that "[b]ecause the State failed to show by clear and convincing evidence that the confession was not the product of coercion *** the defendant's statement should have been suppressed as having been involuntarily given." *Wilson*, 116 Ill. 2d at 41. Consequently, the defendant's cause was remanded for a new trial because "[t]he use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error." *Wilson*, 116 Ill. 2d at 41-42.

In his brief to this court, defendant urges us to interpret *Wilson* as standing for a *per se* rule that any unexplained injury suffered by a defendant while in police custody renders his confession inadmissible. Defendant argues that "according to *Wilson*, the rule in Illinois is that, once the defendant establishes that he was injured while being held by the police for the purposes of interrogation, the State must prove how those injuries occurred." We reject defendant's broad reading of *Wilson* and agree with the lower courts in this case that *Wilson* does not require the State to explain every injury sustained by a defendant while in police custody in order for a confession to be admissible.

For example, a defendant might become injured while in police custody after he voluntarily provides a confession. In order to satisfy its burden under *Wilson*, the State may present evidence that the defendant was uninjured at the time of his confession and that he suffered injuries sometime thereafter. In this manner the State could affirmatively show "that the confession was not the product of coercion." *Wilson*, 116 Ill. 2d at 41. In such circumstances, *Wilson* does not require the State to explain injuries to a defendant that were proven by clear and convincing evidence to have occurred after his

confession; such an inquiry is outside the scope of the *Wilson* rule. We adhere to our holding in *Wilson* that where a defendant establishes that he has been injured while in police custody, a heightened burden of proof is imposed upon the State to show by clear and convincing evidence that "the injuries were not inflicted as a means of producing the confession." *Wilson*, 116 Ill. 2d at 40.

In the case at bar, we are presented with facts similar to those in *Wilson*, in that defendant sustained injuries while in police custody. The trial court found that defendant sustained injuries to his left eye and forehead while in the custody of the Waukegan police. This finding is supported by the two photographs of defendant and is not contested by the State. As noted in *Wilson*, after a defendant has shown that he was injured while in police custody, the State must "show by clear and convincing evidence that the confession was not the product of coercion." *Wilson*, 116 Ill. 2d at 41. In order for the State to meet this heightened evidentiary burden, *Wilson* requires "more than the mere denial by the State's witnesses that the confession was coerced." *Wilson*, 116 Ill. 2d at 40.

The facts in the instant case mirror *Wilson* in that the testimony of the State's witnesses largely consisted of denials that defendant's confession was coerced. See *Wilson*, 116 Ill. 2d at 41. In an effort to support the testimony of the interrogating officers that defendant's confession was not coerced, the State introduced two photographs of defendant and the videotape of defendant refusing to provide a taped statement. However, the photographs and videotape failed to elevate the State's evidence beyond that of mere denials of coercion. Although the State introduced Detective Yancey's testimony that the first photograph of defendant was taken during the booking process after defendant had made his confession, Yancey admitted that, due to an "oversight," routine department procedure was not followed in recording

the time the photograph was taken. In addition, no officer testified that he saw Detective Yancey take the first photograph and no other evidence established the time at which the photograph was taken. Similarly, although the State introduced the post-confession videotape showing defendant refusing to speak to the detectives, this black-and-white videotape is inconclusive, as the camera angle and the positioning of defendant do not afford the viewer an opportunity to assess defendant's condition. Mere denials of coercion by police officers are insufficient to establish by clear and convincing evidence that defendant's injuries were not sustained as a means of eliciting the confession. *Wilson*, 116 Ill. 2d at 41. Accordingly, the trial court erred in denying defendant's motion to suppress his confession.

The lower courts misapplied *Wilson* by focusing upon the credibility of defendant's account of his beating by the detectives, thereby misdirecting the analysis away from the proper inquiry of whether the State satisfied its burden to establish by clear and convincing evidence that defendant's injuries were not inflicted as a means of producing defendant's confession. Although the findings of a trial court are entitled to great weight in its determination of the credibility of witnesses, the question of whether defendant's account of the beating was believable or exaggerated is not the determinative issue in this case.

It is undisputed that defendant was injured while held in the custody of the Waukegan police. Justice Rathje correctly notes in his dissent from the majority appellate court Rule 23 order that defendant was either in the presence of police officers or was in a single-person holding cell from the time he arrived at the Waukegan police department on the evening of April 22 until the morning of April 25, when defendant was booked at the Lake County jail. Thus, assuming the credibility of the

Waukegan officers that defendant was not struck by the police, defendant would have to have been injured by accident, by self-infliction of his injuries, or as a result of a fight with other prisoners. There is no testimony of record that defendant inflicted the injuries upon himself, suffered an accident while at the police station, or was involved in a fight with anyone. Since defendant was either in the presence of the police officers or in a single-person cell at all times, the State should have been able to prove whether defendant sustained the injuries before or after his confession, as well as the cause of his injuries. In this case, the State did not adduce clear and convincing evidence as to when or how defendant's injuries occurred or that these injuries were unrelated to defendant's confession.

On the basis of the evidence presented, the State did not meet its heightened burden of proof under *Wilson*, and "the defendant's statement should have been suppressed as having been involuntarily given." *Wilson*, 116 Ill. 2d at 41. As the use of a coerced confession as substantive evidence of guilt is "never harmless error" (*Wilson*, 116 Ill. 2d at 41), defendant's convictions must be reversed and this cause remanded for a new trial.

The judgments of the appellate and circuit courts are reversed and the cause is remanded to the circuit court for a new trial.

*Judgments reversed;*
*cause remanded.*