NO. 4-08-0619     Filed: 9-11-09

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| RAYMOND WRENCHER, | ) | No. 07CF954 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi Ladd, |
| | ) | Judge Presiding. |

OPINION MODIFIED ON DENIAL OF REHEARING

JUSTICE APPLETON delivered the opinion of the court:

A jury found defendant, Raymond Wrencher, guilty of two counts of aggravated battery (720 ILCS 5/12-4(b)(18) (West Supp. 2007)). The trial court sentenced him to seven years' imprisonment for each count, ordering that the terms run consecutively.

Defendant appeals on two grounds: (1) the trial court violated Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007) during voir dire by failing to adequately question the potential jurors on the four principles in Rule 431(b), and (2) the State failed to present sufficient evidence that defendant's act of spitting on a police officer was "physical contact of an insulting or provoking nature" (720 ILCS 5/12-3(a) (West 2006)). We are issuing this modified decision on denial of defendant's petition for rehearing.

Our basic holdings are the same. We hold that defendant has procedurally forfeited his argument that the trial court violated Rule 431(b) and that because the

violation does not amount to plain error, the forfeiture must be honored. Nevertheless, in this modified decision, we have expanded our discussion of this issue by taking account of the supreme court's recent decision in People v. Glasper, 234 Ill. 2d 173, 917 N.E.2d 401 (2009), which was published after the parties filed their briefs in this appeal.

As for defendant's alternative argument, we still find sufficient evidence that his act of spitting on the police officer was insulting or provoking. Therefore, we affirm the trial court's judgment.

## I. BACKGROUND

### A. The Indictment

A grand jury returned an indictment charging defendant with two counts of aggravated battery (720 ILCS 5/12-4(b)(18) (West Supp. 2007)). One count alleged that on June 5, 2007, he spat blood on a Champaign police officer, Mark Briggs. The other count alleged that on the same date, he dug his fingernails into the hand of another Champaign police officer, Gregory Manzana.

### B. Voir Dire

The trial occurred in June 2008. At the beginning of voir dire, the trial court addressed the entire venire as follows:

"The defendant is presumed to be innocent, and this presumption remains with him throughout the case[] and is not overcome unless[,] from all the evidence, you are convinced[,] beyond a reasonable doubt[,] that the defendant is guilty. Before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The burden of proof is

on the State, and that burden never shifts. The defendant is not required to present evidence, and he is not required to prove his innocence. The defendant is not required to testify. If the defendant does not testify, the fact that he did not testify may not be considered by you in any way."

During its questioning of the first panel, the trial court again recited the principles in Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). The court stated:

"With regard[] to our four potential jurors, I'm going to go over again the principles of law you must follow[,] and then I will inquire individually about those. The defendant is presumed innocent of the charges against him. Before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. He is not required to offer any evidence or testify in his own behalf, and if he elects not to testify, the fact that he did not testify may not be held against him in any way."

The court then asked the four persons in the first panel--Karen Ray, Nathan Thompson, Gail Carlson, and Brian Daube–if they understood and accepted those principles. Each of the four answered yes. Defense counsel asked each of them if he or she was "presuming Raymond Wrencher to be innocent right now" and if he or she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Each answered yes.

Defense counsel requested that Thompson be excused. Emily Burdette

- 3 -

replaced him.  Instead of repeating the principles from Rule 431(b), the trial court asked Burdette:

> "THE COURT:  Were you able to hear me explain the principles of law that you have to follow as a juror?
>
> MS. BURDETTE:  Yes.
>
> THE COURT:  And did you understand those[,] and would you also accept those?
>
> MS. BURDETTE:  Yes."

Defense counsel asked Burdette if she was "presuming Raymond Wrencher to be innocent right now" and if she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt."  She answered yes to both questions.  Ray, Carlson, Daube, and Burdette were selected to be jurors.

The second panel consisted of Nicole Vangrinsven, Elizabeth Riddle, Nicholas Schneider, and Alex Lewis.  Instead of repeating the Rule 431(b) principles, the trial court asked them the following questions:

> "THE COURT:  Mr. Lewis, were you able to hear me explain the principles of law that apply?
>
> MR. LEWIS:  Yes.
>
> THE COURT:  Sir, do you understand those[,] and would you accept those?
>
> MR. LEWIS:  Yes.
>
> THE COURT:  You as well, Mr. Schneider?
>
> MR. SCHNEIDER:  Yes.

THE COURT: So[,] you as well, Mrs. Riddle?

MS. RIDDLE: Yes.

THE COURT: Do you as well, Ms. Vangrinsven?

MS. VANGRINSVEN: Yes."

Defense counsel asked each of the four potential jurors--Vangrinsven, Riddle, Schneider, and Lewis--if he or she was "presuming Raymond Wrencher to be innocent right now" and if he or she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Each of the four answered yes.

The defense requested that Schneider and Riddle be excused. Roberta McEntire and Sandra McCabe replaced them. Again, the trial court did not repeat the principles from Rule 431(b) but asked McEntire and McCabe if they had heard the principles the court explained earlier and if they would follow those principles. They answered yes to both questions. Defense counsel asked McEntire and McCabe if they were "presuming Raymond Wrencher to be innocent right now" and if they understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." They answered yes to these questions. Both sides accepted Vangrinsven, Lewis, McEntire, and McCabe as jurors. There was a 15-minute recess.

The clerk called four more potential jurors for the third and final panel: Stacy Conlee, Greer Williams, Kathleen Liffick, and Nancy Pellett. Rather than repeat the Rule 431(b) principles, the trial court asked them if they had heard the court explain the principles earlier and if they understood those principles and would follow them. They answered yes. Again, defense counsel asked them if they were "presuming Raymond Wrencher to be innocent right now" and if they understood that "the State's Attorney ha[d]

- 5 -

a burden of proving him guilty beyond a reasonable doubt." They answered yes.

The defense requested that Conlee be excused. Kurt Henke replaced her. The trial court asked Henke if he was "able to hear [the court] explain the principles of law that appl[ied] [to the case]" and if he understood those principles and was willing to apply them. Henke answered yes. Defense counsel asked Henke if he was "presuming Raymond Wrencher to be innocent right now" and if he understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Henke answered yes. The parties accepted Williams, Liffick, Pellett, and Henke as jurors.

The parties selected two alternate jurors, Georgia O'Connor and Donna Chin. As it turned out, all of the jurors served throughout the trial, and O'Connor and Chin did not have to take anyone's place.

## C. Evidence at Trial

Gregory Manzana testified that on June 5, 2007, he went to 408 West Maple Street in response to a report of a domestic dispute. He arrived in a marked squad car and in full uniform. He saw a car in the driveway with its engine running, and he pulled in behind the car so it could not back out. He shone his spotlight on the car, and it appeared to be occupied by four to six individuals. These individuals began exiting the car, and Manzana ordered everyone to get back in.

Defendant ignored the order and continued to walk away. Manzana approached him and told him to put his hands behind his back. Defendant continued walking and made no movement to comply. Manzana grabbed him by the arm, and defendant tried to pull away. Another officer, named Ferguson, grabbed defendant's other arm. Defendant struggled with them. Over and over again, Manzana yelled at defendant

to get down on the ground, but defendant spread his legs and braced himself, resisting their efforts to take him down. Manzana brought defendant to the ground by tripping him. They succeeded in forcing his arms behind his back and putting the handcuffs on him.

Several other police officers arrived and kept defendant pinned to the ground while Manzana went to check on the welfare of the woman who had called in. After speaking with her, Manzana returned to defendant. Manzana testified:

"A. He was yelling[,] and he was still on the ground[,] there in the street. At that point[,] *** we decided to go ahead and move him to the squad car. I took his right hand with my left hand and grabbed his right arm with my right hand, like around the bicep, and we picked him up, brought him up to his feet.

Q. What happened next?

A. At that point[,] he looked me directly in the eye, kind of--he tensed up, I could see his jaw clench, his shoulders kind of tensed up, next thing I know[,] he started squeezing my hand and gripping into it and digging his nails into my fingers.

Q. What happened next?

A. *** I tried to pull my hand away[,] and his grip was too strong. I couldn't pull it away, so I gave him a couple of diversionary strikes to the stomach[,] and he immediately let go, and I was able to pull my hand off.

Q. Now[,] when the defendant *** had ahold of your

hand, did that cause you any pain?

A. Yes.

Q. Could you explain?

A. *** [H]e was squeezing the heck out of my hand there, and it felt *** like his nails were cutting into my skin there, and it just [was] like *** somebody is just trying to crunch your hand there ***."

Manzana testified that after defendant let go of his hand, "the tips of [his] middle ring and [little] finger[s] [of his left hand] were red and throbbing[] and [he] had a cut *** on the inside of [his little finger]." People's exhibit No. 4 was a photograph of a small laceration on the tip of Manzana's little finger. He testified that defendant had inflicted this injury.

After Manzana freed himself from defendant's grasp, other police officers escorted defendant to the squad car. Defendant sat down in the squad car but would not put his legs in. He started kicking at officers. Manzana warned him to stop resisting or he would use pepper spray on him. Defendant replied to go ahead, whereupon he resumed kicking at the officers. Manzana gave him a one-second burst of pepper spray.

Mark Briggs testified that after Manzana applied the pepper spray, defendant stopped kicking at the officers but still refused to put his legs in the squad car. An officer went around to the driver's side, grabbed defendant by the arms, and pulled him the rest of the way into the squad car so they could shut the rear passenger door. Defendant immediately started thrashing around. Concerned that he might kick out the windows, Briggs asked the other officers if they had leg restraints. They had none with them, so leg

restraints had to be brought to the scene. In the meantime, Briggs talked to defendant and tried to calm him down.

When the leg restraints arrived, defendant stepped out of the squad car as directed. Briggs testified:

> "I turned him around, had him face the trunk. He is standing on the driver's side of the car at this point. Officer Shipley stepped up, applied the leg restraints, double[-]locked them so they wouldn't tighten down on his ankles, and then[,] all of a sudden[,] Raymond turned and spit a mouth full of blood and pepper spray across the front of my shirt."

Briggs "immediately reacted by forcing [defendant] down over the trunk of the car to prevent [himself] from being sp[a]t on again. In [the process], [defendant] hit his left eyebrow on the back windshield of the car." Briggs did not know specifically how defendant had come to have a mouthful of blood.

According to Briggs, it was "for the purpose of officer safety" that he held defendant's head down on the trunk of the squad car. When defendant tried to pull himself back up, Briggs used his thumb to apply pressure to the mandibular joint, and another officer, named Gallagher, put defendant in a wrist lock. Briggs testified: "[W]e just basically held him station[a]ry while we ordered him to stop spitting."

With his face pressed against the trunk of the squad car, defendant told Briggs and Gallagher, " 'Okay, I'm done. I'm sorry. I won't do it again.' " Briggs pulled him up and directed him to sit inside the squad car. Defendant did so. Briggs testified:

> "A. *** As soon as we closed the door, he started spitting

all over the back of the squad car again[] and cursing at us and basically going off.

Q. What happened after that?

A. We applied what's called a [']spit hood['] to his head. It kind of goes over your head and covers your mouth so if you want to spit, the only person [who is] going to be affected is you."

Briggs identified People's exhibit No. 1 as a photograph of his uniform shirt. He testified the photograph was taken immediately after defendant spat on him and it showed blood on the front of the shirt and down the left sleeve.

Defendant took the stand and denied digging his fingernails into Manzana's hand and spitting on Briggs. He did not know how the blood had got on Briggs's shirt.

The jury found defendant guilty of both counts of aggravated battery.

Afterward, one of the alternate jurors, Georgia O'Connor, wrote the trial court, expressing dissatisfaction with the trial. She criticized defense counsel for failing to question witnesses and for his general failure to "do any defending." She thought defense counsel should have pointed out that the photographed wound on Manzana's little finger did not look like a fingernail wound. She also thought defense counsel could have done a better job exploring discrepancies in the police officers' testimony.

## II. ANALYSIS

### A. Rule 431(b)

#### 1. Our Standard of Review

Defendant argues that in questioning the potential jurors during voir dire, the

- 10 -

trial court failed to comply with Illinois Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). For two reasons, defendant suggests that we should evaluate this argument <u>de novo</u>. First, the parties have no factual dispute as to what questions were asked of the potential jurors. By contrast, a deferential standard of review would be justified if the trial court had to assess the credibility of witnesses, for trial courts are in a better position than reviewing courts to do that. See <u>People v. Woods</u>, 184 Ill. 2d 130, 146, 703 N.E.2d 35, 42 (1998). In the present case, ascertaining what questions were asked of potential jurors requires no assessment of any witness's credibility. All we have to do is read the transcript of <u>voir dire</u>. There were no witnesses as of yet and hence no occasion for assessing their credibility. See <u>People v. Luczak</u>, 374 Ill. App. 3d 172, 176, 869 N.E.2d 1185, 1189 (2007).

Second, defendant notes that the construction of a supreme court rule, such as Rule 431(b), is a question of law. See <u>Robidaux v. Oliphant</u>, 201 Ill. 2d 324, 332, 775 N.E.2d 987, 992 (2002). The State does not disagree that in deciding the issue regarding Rule 431(b), we should apply a <u>de novo</u> standard of review. Therefore, we will decide <u>de novo</u> whether the trial court's method of inquiry during <u>voir dire</u> calls for the vacation of defendant's convictions and the remand of his case for a new trial. See <u>People v. Yusuf</u>, No. 4-08-0034 slip op. at 5 (April 13, 2010), ____ Ill. App. 3d ____, ____, ____ N.E.2d ____, ____.

### 2. <u>The Doctrine of Plain Error</u>

If the trial court makes an error, the defendant must do two things in order for us to review the error. First, the defendant must object at the time the court makes the error. Second, the defendant must raise the error again in a posttrial motion. <u>People v. Lewis</u>, 234 Ill. 2d 32, 40, 912 N.E.2d 1220, 1225 (2009). Defendant took neither of those

steps with respect to the error in voir dire, and he concedes that as a consequence, he has forfeited review of the error.

Defendant urges us, however, to disregard the forfeiture because he contends that the error in voir dire was plain error. The doctrine of plain error allows us to review a forfeited error in either of two circumstances: (1) the evidence in the case was so closely balanced that the error might have been the deciding factor that tipped the scales in favor of conviction; or (2) the error was so serious that regardless of whether the evidence was closely balanced, the error denied the defendant a substantial right and therefore a fair trial. People v. Herron, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005). According to defendant, the trial court's error in voir dire was plain error in the second sense.

Before deciding whether the trial court committed plain error, we might ask whether the court committed any error at all. People v. Bannister, 232 Ill. 2d 52, 65, 902 N.E.2d 571, 581 (2008). Without error, there can be no plain error. If we find error, we then can take up the question of whether the error amounts to plain error.

According to defendant, the trial court violated Rule 431(b) in two ways. First, defendant complains that the court failed to question the potential jurors individually about the four principles in Rule 431(b). Under the plain language of Rule 431(b), however, a court has the option of questioning the potential jurors as a group. The rule reads as follows:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a

defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.) Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

Second, defendant contends that the length of time between the trial court's recitation of the four principles and its putting to the potential jurors the general question of whether they understood the principles and would follow them greatly reduced whatever usefulness the question otherwise would have had. Defendant observes: "When the final panel of jurors were [sic] questioned, the transcript reflects that 89 pages of transcript had been recorded and the court had adjourned for a 15[-]minute recess since informing the jurors about the 431(b) principles." We agree with defendant that the questioning on a principle from Rule 431(b) must occur soon after the court's statement of the principle to the potential jurors. See People v. Wheeler, No. 1-08-1370 slip op. at 6-7 (March 31, 2010), ____ Ill. App. 3d ____, ____, ____ N.E.2d ____, ____. Reciting the four principles and then, an hour or so later, asking the potential jurors if they understood the principles and would

follow them tends to defeat the purpose of the questioning and reduces it to a pro forma exercise.

Hence, we find error in the trial court's method of questioning the potential jurors during voir dire. A recent decision by the supreme court, however, refutes defendant's argument that the error was plain error. In Glasper, 234 Ill. 2d at 188, 917 N.E.2d at 411, before voir dire, defense counsel requested the trial court to ask the potential jurors if they understood and accepted the principle that if the defendant chose not to take the stand at trial, that choice was not to be held against him. The court responded that it would instruct the potential jurors on that principle but would not question them about it. Glasper, 234 Ill. 2d at 188, 917 N.E.2d at 411. The court addressed the potential jurors as a group, instructing them that they were not to consider in any way the defendant's choice to refrain from testifying. Glasper, 234 Ill. 2d at 188, 917 N.E.2d at 411. The court then questioned the potential jurors individually but did not ask them if the defendant's decision not to testify would influence their verdicts. Glasper, 234 Ill. 2d at 189, 917 N.E.2d at 411. Under the version of Rule 431(b) that was in effect at the time of trial, the court was obligated, upon the defendant's request, to ask each potential juror, individually or in a group, whether that juror understood and accepted certain constitutional principles, including the principle that "'the defendant's failure to testify [could] not be held against him.'" Glasper, 234 Ill. 2d at 187, 917 N.E.2d at 410, quoting 177 Ill. 2d R. 431(b). (The use of the word "failure" in Rule 431(b) is unfortunate. If defendants have an absolute right not to testify and their decision to avail themselves of that right is not to be held against them in any way, that choice is not a "failure" on their part.)

As the supreme court noted, it had amended Rule 431(b) effective May 1,

2007, by removing the condition that the defendant request such questioning (Official Reports Advanced Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). <u>Glasper</u>, 234 Ill. 2d at 187 n.2, 917 N.E.2d at 411 n.2. Now the rule affirmatively requires the trial court to question potential jurors on the constitutional principles listed therein, regardless of whether the defendant requests such questioning. The supreme court decided <u>Glasper</u> under the preamended version of Rule 431(b), the version that begins with the qualifying phrase "If requested by the defendant." 177 Ill. 2d R. 431(b).

The defendant in <u>Glasper</u> argued that the trial court had committed reversible error by failing to question the potential jurors on their obligation not to draw any adverse inference from his choice to refrain from testifying--a question Rule 431(b) (177 Ill. 2d R. 431(b)) required the court to ask upon request by the defendant--and he further argued that this error could never be considered harmless. <u>Glasper</u>, 234 Ill. 2d at 185, 917 N.E.2d at 409. Although the supreme court agreed with the defendant that the trial court had violated Rule 431(b) and thereby had erred (<u>Glasper</u>, 234 Ill. 2d at 189, 917 N.E.2d at 411), the supreme court disagreed that such an error was prejudicial <u>per</u> <u>se</u> and cause for automatic reversal (<u>Glasper</u>, 234 Ill. 2d at 199-200, 917 N.E.2d at 417-18). The error, the supreme court said, "[did] not involve a fundamental right[] or even a constitutional protection"; the defendant's right to the questioning of potential jurors derived solely from Rule 431(b). <u>Glasper</u>, 234 Ill. 2d at 193, 917 N.E.2d at 413-14. Not every violation of a supreme court rule mandated reversal. <u>Glasper</u>, 234 Ill. 2d at 193, 917 N.E.2d at 414. Questioning of potential jurors in accordance with Rule 431(b) was not indispensable to a fair trial; that much was evident from the original version of the rule (177 Ill. 2d R. 431(b)), which required such questioning only upon request by the defendant. <u>Glasper</u>, 234 Ill. 2d

at 196-97, 917 N.E.2d at 416. Omission of such questioning was not structural error or error from which harm could be presumed. Glasper, 234 Ill. 2d at 199, 917 N.E.2d at 417. The supreme court was unwilling to presume that the jurors were biased, and that they ignored the trial court's admonitions and instructions, just because the trial court failed to ask them the questions that Rule 431(b) required. Glasper, 234 Ill. 2d at 201, 917 N.E.2d at 418.

The supreme court concluded: "[A] violation of Rule 431(b), as applied in this case, does not require automatic reversal and is amenable to harmless error review." Glasper, 234 Ill. 2d at 200, 917 N.E.2d at 418. After reviewing the evidence, the supreme court found that the error was "harmless beyond a reasonable doubt" and that "no rational juror would have acquitted [the] defendant of the offenses for which he was charged." Glasper, 234 Ill. 2d at 202-03, 917 N.E.2d at 419. (It is unclear why the supreme court used the standard of harmless beyond a reasonable doubt, for, as Justice Burke observed in her dissent, that standard traditionally applied only to constitutional error and the majority had held that the right to the questioning of potential jurors derived solely from Rule 431(b) and not from the federal or state constitution. Glasper, 234 Ill. 2d at 220 n.4, 917 N.E.2d at 429 n.4 (Burke, J., dissenting).)

After announcing its holding, the supreme court added a complication: "We emphasize that this holding is limited to the version of Rule 431(b) (4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule." Glasper, 234 Ill. 2d at 200, 917 N.E.2d at 418. As we said, before it was amended effective May 1, 2007, Rule 431(b) required the trial court to question the potential jurors on the four principles only if the defendant requested the court to do so. 177 Ill. 2d R. 431(b). The amended rule, which applies to this case, requires the trial court to ask the

- 16 -

questions <u>sua</u> <u>sponte</u>.  Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

According to <u>Glasper</u>, its holding "would not necessarily apply"--that is to say, may or may not apply--to the present version of Rule 431(b).  The supreme court merely was being cautious, deciding only what it had to decide.  The case before the supreme court did not involve the current version of Rule 431(b), and judicial restraint counseled against deciding a question that was not before the court.  It does not follow, however, that we are free to disregard the rationale in <u>Glasper</u> simply because the current version, rather then the former version, of the rule is before us.  To legitimately treat the rationale of <u>Glasper</u> as irrelevant, we will have to do more than (1) point out the change in Rule 431(b) from questioning by request to questioning <u>sua</u> <u>sponte</u> and (2) quote the language in <u>Glasper</u> limiting its holding to the previous version of the rule.  Asserting (1) and (2) only leaves us with the question, So what?

In other words, if, before the amendment of Rule 431(b), the federal or state constitution did not require the trial court to question potential jurors on the four principles in Rule 431(b) and the omission of such questioning was not structural error, it is unclear how the amendment of Rule 431(b) could cause the opposite propositions to hold true.  Surely the amendment of supreme court rules cannot increase or decrease constitutional protections.  A procedure does not logically attain constitutional status, or metamorphose into a "substantial right" (134 Ill. 2d R. 615(a))-- meaning a due-process right (<u>People v. Lindsey</u>, 309 Ill. App. 3d 1031, 1034, 723 N.E.2d 841, 844 (2000), <u>aff'd</u>, 201 Ill. 2d 45, 772 N.E.2d 1268 (2002))--simply by virtue of a rule change requiring the trial court to follow the procedure <u>sua</u> <u>sponte</u>.

- 17 -

The issue still is the observance of a supreme court rule, nothing more. Today a trial court would be obligated to question potential jurors for basically the same reason the trial court was obligated to do so in Glasper: Rule 431(b) requires it. Changing the rule so as to make that obligation automatic rather than dependent upon the defendant's request does not change either the source of the obligation or the nature of the violation. In Glasper, the trial court violated Rule 431(b) by denying the defendant's request to question the potential jurors on a principle in Rule 431(b). Today, a trial court would violate Rule 431(b) by failing to question the potential jurors sua sponte. In both situations, the trial court would have done the same thing: violate Rule 431(b). There is no qualitative difference between the two violations, and if there is no qualitative difference, the prejudice analysis is the same.

In short, just because the obligation is now automatic, it does not logically follow that prejudice is automatic, any more than it was in Glasper. Automatic prejudice should not be confused with an automatic obligation. The question of whether prejudice should be presumed from a violation of the rule has nothing to do with the triggering mechanism within the rule. Breaking the rule is still a violation of the rule, not a violation of the constitution.

We conclude, therefore, that the rationale in Glasper applies to the present version of Rule 431(b). See People v. Hammonds, No. 1-08-0194 slip op. at 56-57 (February 11, 2010), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___. Because questioning potential jurors in accordance with Rule 431(b) is not indispensable to a fair trial (Glasper, 234 Ill. 2d at 196, 917 N.E.2d at 416), we hold that the trial court's noncompliance with Rule 431(b) in this case was not plain error, i.e., "error *** so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process." <u>Herron</u>, 215 Ill. 2d at 187, 830 N.E.2d at 479-80. We further find the error to be harmless because no rational juror could have acquitted defendant.

### 3. <u>Criticism</u> <u>of</u> <u>Defense</u> <u>Counsel</u> <u>By</u> <u>the</u> <u>Alternate</u> <u>Juror</u>

Defendant points to O'Connor's letter as evidence that the trial court's noncompliance with Rule 431(b) had the prejudicial effect of confusing the jurors about the burden of proof. Defendant argues: "[E]ven though the court announced the [Rule] 431(b) principles (including the principle that [defendant] did not have to present evidence) in [O'Connor's] presence, her letter clearly shows that she was under the impression that [defendant], or, more aptly, his attorney, should have presented additional evidence to rebut the State's case."

O'Connor did not sign the guilty verdicts. Besides, her criticism of defense counsel for failing to put on certain evidence and for failing to ask certain questions in cross-examination does not logically imply that defendant had the burden of proof. Otherwise, in criminal trials, there would be no such thing as the defendant's case in chief or the defendant's cross-examination of the State's witnesses: the moment the defense broke its silence, it would be understood as relieving the State of its burden of proof. But cross-examination and evidence by the defense can serve the function of refuting or weakening the State's evidence, which otherwise, in the mind of the jury, might have amounted to proof beyond a reasonable doubt. Rebuttal does not shift the burden of proof; it aims to prevent the State from carrying its burden of proof.

### 4. <u>Structural Defect</u>

Defendant characterizes the violation of Rule 431(b) as a structural defect that

" 'def[ies] analysis by "harmless-error" standards.' " <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281, 124 L. Ed. 2d 182, 190, 113 S. Ct. 2078, 2082 (1993), quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 309, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (1991). Only in rare cases has the Supreme Court held an error to be a structural defect so as to require automatic reversal. <u>Washington v. Recuenco</u>, 548 U.S. 212, 218, 165 L. Ed. 2d 466, 474, 126 S. Ct. 2546, 2551 (2006). Here are the types of error the Supreme Court has held to be structural: (1) complete denial of counsel, (2) a biased trial judge, (3) racial discrimination in the selection of a grand jury, (4) denial of self-representation at trial, (5) denial of a public trial, and (6) a defective reasonable-doubt instruction. <u>Recuenco</u>, 548 U.S. at 218 n.2, 165 L. Ed. 2d at 474 n.2, 126 S. Ct. at 2551 n.2. The error in <u>voir</u> <u>dire</u> of which defendant complains is not on the list and does not even remotely resemble any of the items on the list. Therefore, we reject the characterization of the error as structural. See <u>Glasper</u>, 234 Ill. 2d at 199, 917 N.E.2d at 417.

B. Sufficiency of the Evidence That Spitting on Briggs Was Provoking or Insulting

### 1. <u>Standard</u> <u>of</u> <u>Review</u>

When a defendant claims that the evidence presented at trial is insufficient to sustain his conviction, we look at all the evidence in a light most favorable to the State and ask if any rational trier of fact could find the elements of the charged offense to be proved beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); <u>People v. Minniweather</u>, 301 Ill. App. 3d 574, 577, 703 N.E.2d 912, 913 (1998). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319, 61 L. Ed.

- 20 -

2d at 573, 99 S. Ct. at 2789. We "impinge[] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 574, 99 S. Ct. at 2789.

### 2. Physical Contact of an Insulting or Provoking Nature

To prove defendant guilty of the aggravated battery of Briggs, the State had to prove, beyond a reasonable doubt, that by spitting blood and saliva onto Briggs's torso and arm, defendant made physical contact of an insulting or provoking nature. See 720 ILCS 5/12-3(a) (West 2006). Defendant argues there is no evidence that Briggs was insulted or provoked by defendant's act of spitting on him. Briggs never testified he was insulted or provoked. He never testified he took off his shirt right away or that the blood and saliva got on his skin. We have said: "[W]e can envision contexts in which a defendant's spitting might not constitute insulting or provoking behavior ***." People v. Peck, 260 Ill. App. 3d 812, 814, 633 N.E.2d 222, 224 (1994).

We also can envision contexts in which spitting on someone would be insulting or provoking. For hundreds of years, the common law has regarded deliberate spitting on someone as a battery. Peck, 260 Ill. App. 3d at 814, 633 N.E.2d at 223. The victim does not have to testify he or she was provoked; the trier of fact can make that inference from the victim's reaction at the time. People v. Dunker, 217 Ill. App. 3d 410, 415, 577 N.E.2d 499, 502 (1991). When Briggs testified it was "for the purpose of officer safety" that he pushed defendant's head down onto the trunk of the squad car, the jury could reasonably understand him as meaning "safety from being spat on." In fact, Briggs testified he "immediately reacted by forcing [defendant] down over the trunk of the car to prevent [himself] from being sp[a]t on again." The jury also could infer that the police put a "spit

hood" on defendant because contact with his saliva and blood was repulsive and dangerous to them and, therefore, insulting and provoking.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment and deny defendant's petition for rehearing. We award the State $50 in costs against defendant.

Affirmed.

MYERSCOUGH, P.J., and TURNER, J., concur.