# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Wrencher, 2011 IL App (4th) 080619**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND WRENCHER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-08-0619 |
| Filed | July 19, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's act of spitting on a police officer amounted to "physical contact of an insulting or provoking nature" for purposes of the aggravated battery statute, and although the trial court erred in reciting the *Zehr* principles, the error, based on the violation of Supreme Court Rule 431(b), did not rise to the level of plain error and did not constitute a structural defect. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 07-CF-954; the Hon. Heidi N. Ladd, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Ryan R. Wilson, all of State Appellate Defender's Office, of Springfield, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Perry L. Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.

Justices Turner and McCullough concurred in the judgment and opinion.

# OPINION

¶ 1      A jury found defendant, Raymond Wrencher, guilty of two counts of aggravated battery (720 ILCS 5/12-4(b)(18) (West Supp. 2007)). The trial court sentenced him to seven years' imprisonment for each count, ordering that the terms run consecutively.

¶ 2      Defendant appeals on two grounds. First, he argues that the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) during *voir dire* by failing to adequately question the potential jurors on the four principles in that rule. Defendant acknowledges he has procedurally forfeited this argument, but he maintains we should consider the argument, anyway, because (in his estimation) the violation of Rule 431(b) amounts to plain error and a structural defect.

¶ 3      Second, defendant argues that an element of the crime of aggravated battery is unproved. He claims the State failed to present sufficient evidence that his act of spitting on a police officer was "physical contact of an insulting or provoking nature" (720 ILCS 5/12-3(a) (West 2006)).

¶ 4      We already have issued a decision in this appeal, rejecting both of defendant's contentions and affirming the trial court's judgment. *People v. Wrencher*, 399 Ill. App. 3d 1136 (2009). The supreme court, however, in the exercise of its supervisory authority, has directed us to vacate our judgment in *Wrencher* and to reconsider our judgment in light of *People v. Thompson*, 238 Ill. 2d 598 (2010), to determine if a different result is warranted. *People v. Wrencher*, 239 Ill. 2d 588 (2011) (nonprecedential supervisory order on denial of petition for leave to appeal) (No. 110742).

¶ 5      Accordingly, we vacate *Wrencher*, 399 Ill. App. 3d 1136, and after reconsidering our decision in light of *Thompson*, we arrive at the same conclusions as before. In fact, *Thompson* provides clear confirmation of our originally expressed conclusion that the violations of Rule 431(b), without more, are neither plain error nor structural error. As for defendant's other contention, that the evidence is insufficient, *Thompson* has no tendency to

call into question our conclusion that defendant's act of spitting on the police officer reasonably could be regarded as "physical contact of an insulting or provoking nature." Therefore, we again affirm the trial court's judgment.

¶ 6                                    I. BACKGROUND
¶ 7                                    A. The Indictment
¶ 8        A grand jury returned an indictment charging defendant with two counts of aggravated battery (720 ILCS 5/12-4(b)(18) (West Supp. 2007)). One count alleged that on June 5, 2007, he spat blood on a Champaign police officer, Mark Briggs. The other count alleged that on the same date, he dug his fingernails into the hand of another Champaign police officer, Gregory Manzana.

¶ 9                                    B. *Voir Dire*
¶ 10       The trial occurred in June 2008. At the beginning of *voir dire*, the trial court addressed the entire venire, laying out the principles in Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). The court said:

> "The defendant is presumed to be innocent, and this presumption remains with him throughout the case[ ] and is not overcome unless[,] from all the evidence, you are convinced[,] beyond a reasonable doubt[,] that the defendant is guilty. Before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The burden of proof is on the State, and that burden never shifts. The defendant is not required to present evidence, and he is not required to prove his innocence. The defendant is not required to testify. If the defendant does not testify, the fact that he did not testify may not be considered by you in any way."

¶ 11       During its questioning of the first panel, the trial court again recited the principles in Rule 431(b). The court stated:

> "With regard[ ] to our four potential jurors, I'm going to go over again the principles of law you must follow[,] and then I will inquire individually about those. The defendant is presumed innocent of the charges against him. Before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. He is not required to offer any evidence or testify in his own behalf, and if he elects not to testify, the fact that he did not testify may not be held against him in any way."

The court then asked the four persons in the first panel–Karen Ray, Nathan Thompson, Gail Carlson, and Brian Daube–if they understood and accepted those principles. Each of the four answered yes. Defense counsel asked each of them if he or she was "presuming Raymond Wrencher to be innocent right now" and if he or she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Each answered yes.

¶ 12       Defense counsel requested that Thompson be excused. Emily Burdette replaced him. Instead of repeating the principles from Rule 431(b), the trial court asked Burdette:

> "THE COURT: Were you able to hear me explain the principles of law that you have to follow as a juror?

MS. BURDETTE: Yes.

THE COURT: And did you understand those[,] and would you also accept those?

MS. BURDETTE: Yes."

Defense counsel asked Burdette if she was "presuming Raymond Wrencher to be innocent right now" and if she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." She answered yes to both questions. Ray, Carlson, Daube, and Burdette were selected to be jurors.

¶ 13    The second panel consisted of Nicole Vangrinsven, Elizabeth Riddle, Nicholas Schneider, and Alex Lewis. Instead of repeating the Rule 431(b) principles, the trial court asked them the following questions:

"THE COURT: Mr. Lewis, were you able to hear me explain the principles of law that apply?

MR. LEWIS: Yes.

THE COURT: Sir, do you understand those[,] and would you accept those?

MR. LEWIS: Yes.

THE COURT: You as well, Mr. Schneider?

MR. SCHNEIDER: Yes.

THE COURT: So[,] you as well, Mrs. Riddle?

MS. RIDDLE: Yes.

THE COURT: Do you as well, Ms. Vangrinsven?

MS. VANGRINSVEN: Yes."

Defense counsel asked each of the four potential jurors–Vangrinsven, Riddle, Schneider, and Lewis–if he or she was "presuming Raymond Wrencher to be innocent right now" and if he or she understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Each of the four answered yes.

¶ 14    The defense requested that Schneider and Riddle be excused. Roberta McEntire and Sandra McCabe replaced them. The trial court did not repeat the principles from Rule 431(b) but asked McEntire and McCabe if they had heard the principles the court explained earlier and if they would follow those principles. They answered yes to both questions. Defense counsel asked McEntire and McCabe if they were "presuming Raymond Wrencher to be innocent right now" and if they understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." They answered yes to these questions. Both sides accepted Vangrinsven, Lewis, McEntire, and McCabe as jurors. There was a 15-minute recess.

¶ 15    The clerk called four more potential jurors for the third and final panel: Stacy Conlee, Greer Williams, Kathleen Liffick, and Nancy Pellett. Rather than repeat the Rule 431(b) principles, the trial court asked them if they had heard the court explain the principles earlier and if they understood those principles and would follow them. They answered yes. Again, defense counsel asked them if they were "presuming Raymond Wrencher to be innocent right now" and if they understood that "the State's Attorney ha[d] a burden of proving him guilty

beyond a reasonable doubt." They answered yes.

¶ 16    The defense requested that Conlee be excused. Kurt Henke replaced her. The trial court asked Henke if he was "able to hear [the court] explain the principles of law that appl[ied] [to the case]" and if he understood those principles and was willing to apply them. Henke answered yes. Defense counsel asked Henke if he was "presuming Raymond Wrencher to be innocent right now" and if he understood that "the State's Attorney ha[d] a burden of proving him guilty beyond a reasonable doubt." Henke answered yes. The parties accepted Williams, Liffick, Pellett, and Henke as jurors.

¶ 17    The parties selected two alternate jurors, Georgia O'Connor and Donna Chin. As it turned out, all of the jurors served throughout the trial, and O'Connor and Chin did not have to take anyone's place.

¶ 18                                    C. Evidence at Trial

¶ 19    Gregory Manzana testified that on June 5, 2007, he went to 408 West Maple Street in response to a report of a domestic dispute. He arrived in a marked squad car and in full uniform. He saw a car in the driveway with its engine running, and he pulled in behind the car so that it could not back out. He shone his spotlight on the car, and it appeared to be occupied by four to six individuals. These individuals began exiting the car, and Manzana ordered everyone to get back in.

¶ 20    Defendant ignored the order and continued to walk away. Manzana approached him and told him to put his hands behind his back. Defendant kept walking and showed no inclination to comply. Manzana grabbed him by the arm, and defendant tried to pull away. Another officer, named Ferguson, grabbed defendant's other arm. Defendant struggled with them. Over and over again, Manzana yelled at defendant to get down onto the ground, but defendant spread his legs and braced himself, resisting their efforts to take him down. Manzana brought defendant to the ground by tripping him. The officers succeeded in forcing defendant's arms behind his back and putting the handcuffs on him.

¶ 21    Several other police officers arrived and kept defendant pinned to the ground while Manzana went to check on the welfare of the woman who had called in. After speaking with her, Manzana returned to defendant.

¶ 22    Manzana testified:

"A. He was yelling[,] and he was still on the ground[,] there in the street. At that point[,] *** we decided to go ahead and move him to the squad car. I took his right hand with my left hand and grabbed his right arm with my right hand, like around the bicep, and we picked him up, brought him up to his feet.

Q. What happened next?

A. At that point[,] he looked me directly in the eye, kind of–he tensed up, I could see his jaw clench, his shoulders kind of tensed up, next thing I know[,] he started squeezing my hand and gripping into it and digging his nails into my fingers.

Q. What happened next?

A. *** I tried to pull my hand away[,] and his grip was too strong. I couldn't pull it

away, so I gave him a couple of diversionary strikes to the stomach[,] and he immediately let go, and I was able to pull my hand off.

Q. Now[,] when the defendant *** had ahold of your hand, did that cause you any pain?

A. Yes.

Q. Could you explain?

A. *** [H]e was squeezing the heck out of my hand there, and it felt *** like his nails were cutting into my skin there, and it just [was] like *** somebody is just trying to crunch your hand there ***."

¶ 23 Manzana testified that after defendant let go of his hand, the tips of his middle ring and little fingers of his left hand were red and throbbing and he had a cut on the inside of his little finger. People's exhibit No. 4 was a photograph of a small laceration on the tip of Manzana's little finger. He testified that defendant had inflicted this injury.

¶ 24 After Manzana freed himself from defendant's grasp, other police officers escorted defendant to the squad car. Defendant sat down in the squad car but would not put his legs in. He kicked at officers. Manzana warned him to stop resisting or he would use pepper spray on him. Defendant replied to go ahead, and he resumed kicking at the officers. Manzana gave him a one-second burst of pepper spray.

¶ 25 Mark Briggs testified that after Manzana applied the pepper spray, defendant stopped kicking at the officers but still refused to put his legs inside the squad car. An officer went around to the driver's side, grabbed defendant by the arms, and pulled him the rest of the way into the squad car so that they could shut the rear passenger door. Defendant immediately started thrashing around. Concerned that defendant might kick out the windows, Briggs asked the other officers if they had leg restraints. They had none with them. Leg restraints had to be brought to the scene. In the meantime, Briggs talked to defendant and tried to calm him down.

¶ 26 When the leg restraints arrived, defendant stepped out of the squad car as directed. Briggs testified:

"I turned him around, had him face the trunk. He is standing on the driver's side of the car at this point. Officer Shipley stepped up, applied the leg restraints, double[-]locked them so they wouldn't tighten down on his ankles, and then[,] all of a sudden[,] Raymond turned and spit a mouth full of blood and pepper spray across the front of my shirt."

Briggs "immediately reacted by forcing [defendant] down over the trunk of the car to prevent [himself] from being sp[a]t on again. In [the process], [defendant] hit his left eyebrow on the back windshield of the car." Briggs did not know specifically how defendant had come to have a mouthful of blood.

¶ 27 According to Briggs, it was "for the purpose of officer safety" that he held defendant's head down on the trunk of the squad car. When defendant tried to pull himself back up, Briggs used his thumb to apply pressure to the mandibular joint, and another officer, named Gallagher, put defendant in a wrist lock. Briggs testified: "[W]e just basically held him

station[a]ry while we ordered him to stop spitting."

¶ 28 With his face pressed against the trunk of the squad car, defendant told Briggs and Gallagher, " 'Okay, I'm done. I'm sorry. I won't do it again.' " Briggs pulled him up and directed him to sit inside the squad car. Defendant did so. Briggs testified:

"A. *** As soon as we closed the door, he started spitting all over the back of the squad car again[ ] and cursing at us and basically going off.

Q. What happened after that?

A. We applied what's called a [']spit hood['] to his head. It kind of goes over your head and covers your mouth so if you want to spit, the only person [who is] going to be affected is you."

¶ 29 Briggs identified People's exhibit No. 1 as a photograph of his uniform shirt. He testified the photograph was taken immediately after defendant spat on him and that it showed blood on the front of the shirt and down the left sleeve.

¶ 30 Defendant took the stand and denied digging his fingernails into Manzana's hand and denied spitting on Briggs. He insisted he had no knowledge of how blood had got on Briggs's shirt.

¶ 31 The jury found defendant guilty of both counts of aggravated battery.

¶ 32 Afterward, one of the alternate jurors, Georgia O'Connor, wrote the trial court, expressing dissatisfaction with the trial. She criticized defense counsel for failing to question witnesses and for his general failure to "do any defending." She thought defense counsel should have pointed out that the photographed wound on Manzana's little finger did not look like a fingernail wound. She also thought defense counsel could have done a better job exploring discrepancies in the police officers' testimony.

¶ 33 II. ANALYSIS

¶ 34 A. Rule 431(b)

¶ 35 1. *Standard of Review*

¶ 36 Defendant argues that in questioning the potential jurors during *voir dire*, the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For two reasons, defendant suggests that we should evaluate this argument *de novo*. First, the parties have no factual dispute as to what questions were asked of the potential jurors. By contrast, a deferential standard of review would be justified if the trial court had to assess the credibility of witnesses–for trial courts are in a better position than reviewing courts to do that. See *People v. Woods*, 184 Ill. 2d 130 (1998). In the present case, defendant points out, ascertaining what questions were asked of potential jurors requires no assessment of any witness's credibility. All we have to do is read the transcript of *voir dire*. There were no witnesses as of yet (during *voir dire*) and hence no occasion for assessing their credibility. See *People v. Luczak*, 374 Ill. App. 3d 172, 176 (2007).

¶ 37 Second, defendant notes that the construction of a supreme court rule, such as Rule 431(b), is a question of law. See *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002). The State does not disagree that in deciding the issue regarding Rule 431(b), we should apply a *de novo*

standard of review. Therefore, we will decide *de novo* whether the trial court's method of inquiry during *voir dire* calls for the vacation of defendant's convictions and the remand of his case for a new trial. See *People v. Yusuf*, 409 Ill. App. 3d 435, 438 (2011) ("This court reviews *de novo* a trial court's compliance with a supreme court rule.").

¶ 38                                    2. *Plain Error and Structural Error*

¶ 39    If the trial court makes an error, the defendant must do two things in order for us to review the error on appeal. First, the defendant must object at the time the court makes the error. Second, the defendant must raise the error again in a posttrial motion. *People v. Lewis*, 234 Ill. 2d 32, 40 (2009). Defendant took neither of those steps with respect to the asserted error in *voir dire*, and he concedes that as a consequence, he has forfeited review of that error.

¶ 40    Defendant urges us, however, to disregard the forfeiture because he contends that the error in *voir dire* was a plain error and a structural defect. The doctrine of plain error allows us to review a forfeited error in either of two circumstances: (1) the evidence in the case was so closely balanced that the error might have been the deciding factor that tipped the scales in favor of conviction; or (2) the error was so serious that regardless of whether the evidence was closely balanced, the error denied the defendant a substantial right and therefore a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). According to defendant, the trial court's error in *voir dire* was plain error in the second sense.

¶ 41    Before deciding whether the trial court committed plain error, we might ask whether the court committed any error at all. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). Obviously, without error, there can be no plain error. If we find error, we then can take up the question of whether the error amounts to plain error.

¶ 42    According to defendant, the trial court violated Rule 431(b) in two ways. First, defendant complains that the court failed to question the potential jurors individually about the four principles in Rule 431(b).

¶ 43    Under the plain language of Rule 431(b), however, a court has the option of questioning the potential jurors as a group. The rule reads as follows:

   "(b) The court shall ask each potential juror, *individually or in a group*, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

   The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 44    Second, defendant contends that the length of time between the trial court's recitation of

the four principles and its asking the potential jurors the general question of whether they understood the principles and would follow them greatly reduced whatever usefulness the question otherwise would have had. Defendant observes: "When the final panel of jurors were [*sic*] questioned, the transcript reflects that 89 pages of transcript had been recorded and the court had adjourned for a 15[-]minute recess since informing the jurors about the 431(b) principles." From a practical point of view, we agree with defendant that the questioning on a principle from Rule 431(b) must occur soon after the court's statement of the principle to the potential jurors. Reciting the four principles and then, an hour or so later, asking the potential jurors if they understood the principles and would follow them tends to defeat the purpose of the questioning and threatens to reduce it to a *pro forma* exercise. Hence, in this respect, we find error in the trial court's method of questioning the potential jurors during *voir dire*.

¶ 45    *Thompson*, however, refutes defendant's argument that the error was plain error in the sense of an error so serious as to deny him a substantial right and therefore a fair trial. *Herron*, 215 Ill. 2d at 179. In *Thompson*, 238 Ill. 2d at 615, the supreme court held that by merely asserting a violation of Rule 431(b), the defendant did not meet his burden of showing that the error had affected the fairness of the trial and had compromised the integrity of the judicial process. "[T]he failure to conduct Rule 431(b) questioning does not necessarily result in a biased jury ***." *Thompson*, 238 Ill. 2d at 614. And like the defendant in *Thompson*, defendant in the present case has presented no evidence that the jury was biased. See *id*.

¶ 46    This failure to carry his burden of showing plain error also defeats defendant's claim of structural error. The supreme court has equated the second prong of plain-error review with structural error; the two concepts are identical. *Thompson*, 238 Ill. 2d at 613-14. Because we find no plain error, we find no structural defect. See *Thompson*, 238 Ill. 2d at 611. "Although compliance with Rule 431(b) is important, violation of the rule does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or innocence," especially considering that the trial court repeatedly recited the four principles in Rule 431(b). *Id*.

¶ 47                    3. *Criticism of Defense Counsel by the Alternate Juror*

¶ 48    Defendant points to O'Connor's letter as evidence that the trial court's noncompliance with Rule 431(b) had the prejudicial effect of confusing the jurors about the burden of proof. Defendant argues: "[E]ven though the court announced the [Rule] 431(b) principles (including the principle that [defendant] did not have to present evidence) in [O'Connor's] presence, her letter clearly shows that she was under the impression that [defendant], or, more aptly, his attorney, should have presented additional evidence to rebut the State's case."

¶ 49    O'Connor, however, did not sign the guilty verdicts. Besides, her criticism of defense counsel for failing to put on certain evidence and for failing to ask certain questions in cross-examination does not logically imply that defendant had the burden of proof. Otherwise, in criminal trials, there would be no such thing as the defendant's case in chief or the defendant's cross-examination of the State's witnesses: the moment the defense broke its silence, it would be understood as relieving the State of its burden of proof. But cross-

examination and evidence by the defense can serve the function of refuting or weakening the State's evidence, which otherwise, in the mind of the jury, might have amounted to proof beyond a reasonable doubt. Rebuttal does not shift the burden of proof; it aims to prevent the State from carrying its burden of proof.

¶ 50                    B. Sufficiency of the Evidence That Spitting on Briggs
                                  Was Provoking or Insulting

¶ 51                              1. *Standard of Review*

¶ 52    When a defendant claims that the evidence presented at trial is insufficient to sustain his conviction, we look at all the evidence in a light most favorable to the State and ask if any rational trier of fact could find the elements of the charged offense to be proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Minniweather*, 301 Ill. App. 3d 574, 577 (1998). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We "impinge[ ] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319.

¶ 53                 2. *Physical Contact of an Insulting or Provoking Nature*

¶ 54    To prove defendant guilty of the aggravated battery of Briggs, the State had to prove, beyond a reasonable doubt, that by spitting blood and saliva onto Briggs's torso and arm, defendant made physical contact of an insulting or provoking nature. See 720 ILCS 5/12-3(a) (West 2006). According to defendant, no evidence shows that Briggs was in fact insulted or provoked by defendant's act of spitting on him. Briggs never testified he was insulted or provoked. He never testified he took off his shirt right away or that the blood and saliva got on his skin. We have said: "[W]e can envision contexts in which a defendant's spitting might not constitute insulting or provoking behavior ***." *People v. Peck*, 260 Ill. App. 3d 812, 814-15 (1994).

¶ 55    We also can envision contexts in which spitting on someone would be insulting or provoking. For hundreds of years, the common law has regarded deliberate spitting on someone as a battery. *Peck*, 260 Ill. App. 3d at 814. The victim does not have to testify he or she was provoked; the trier of fact can make that inference from the victim's reaction at the time. *People v. Dunker*, 217 Ill. App. 3d 410, 415 (1991). When Briggs testified it was "for the purpose of officer safety" that he pushed defendant's head down onto the trunk of the squad car, the jury could reasonably understand him as meaning "safety from being spat on." In fact, Briggs testified he "immediately reacted by forcing [defendant] down over the trunk of the car to prevent [himself] from being sp[a]t on again." The jury also could infer that the police put a "spit hood" on defendant because contact with his saliva and blood was repulsive and dangerous to them and, therefore, insulting and provoking.

¶ 56                                    III. CONCLUSION

¶ 57        For the foregoing reasons, we affirm the trial court's judgment. We award the State $50
in costs against defendant.


¶ 58        Affirmed.