2021 IL App (1st) 171896-U

No. 1-17-1896

March 10, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 4769 |
| | ) | |
| JOSE RODRIGUEZ, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1    *Held*:  Defendant's conviction for domestic battery is affirmed over his challenge to the sufficiency of the evidence when the State proved beyond a reasonable doubt that he knowingly made insulting or provoking contact with a family or household member by grabbing his son's mother while she walked him to daycare.

¶ 2    Following a bench trial, defendant Jose Rodriguez was found guilty of domestic battery and sentenced to 2½ years' imprisonment. Defendant argues that the State failed to prove his guilt

beyond a reasonable doubt because his contact with the victim's arm was not knowingly insulting or provoking. We affirm.

¶ 3    Defendant was charged by information with one count of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)) for making physical contact of an insulting or provoking nature with a family or household member, Diana Garcia, with whom he has a child in common. The information further alleged that defendant had been previously convicted of domestic battery.

¶ 4    Before trial, the State filed a motion to admit proof of other crimes comprising four prior incidents between defendant and Garcia. Following a hearing, the court granted the motion as to two of the incidents for purposes of showing propensity, lack of mistake, and motive. First, the State alleged that, in 2009, defendant pled guilty to misdemeanor domestic battery following allegations that he pulled Garcia's hair and punched her in the mouth, lacerating her lip. Second, defendant was charged with burglary and convicted of the lesser-included offense of misdemeanor theft based on an incident on February 22, 2016, wherein defendant took a television, tablet, and jewelry from Garcia's home.

¶ 5    At trial, Lilly Miranda testified that she was working as a crossing guard at the corner of 18th Street and Paulina Street around 7:15 a.m. on March 9, 2016. The intersection is near a daycare to which Garcia takes her son every day. Miranda saw Garcia stop at the intersection with her son and a man, whom Miranda had seen one time before and identified in court as defendant. Miranda was wearing earplugs and could not hear defendant say anything, but she saw defendant as he "grabbed [Garcia] from the arm." The State noted for the record that Miranda demonstrated the man's action by grabbing her left arm just above the elbow. When defendant grabbed Garcia,

she "pulled away from him" and crossed the street. Defendant followed Garcia until she entered the daycare. Miranda did not see defendant touch Garcia at any other time.

¶ 6    On cross-examination, Miranda stated that she saw defendant walking with Garcia and her son for half of a block before stopping at the intersection, when he grabbed her left arm. Defendant and Garcia conversed while they walked, but Miranda could not hear them. Miranda did not see defendant kneel and kiss the boy after grabbing Garcia. Defendant did not stop Garcia from crossing the street. Defendant followed Garcia but Miranda could not see whether defendant entered the daycare. Miranda's attention was on her duties as a crossing guard, but she "saw that something was going on, and [she] knew that maybe [Garcia] was in trouble." She did not feel the need to call the police. Miranda had not viewed video of the incident.

¶ 7    Through a Spanish interpreter, Garcia testified that she had a five-year-old son with defendant. Garcia's son attended the daycare on Paulina. Just after 7 a.m. on March 9, 2016, Garcia saw defendant when she and their son exited the bus to go to the daycare. Defendant approached them and "started screaming at [her]." Garcia did not respond because she "just wanted to walk." As Garcia and her son walked down the street, defendant told her that he would take legal action against her because she would not let him see their son, he was "getting into serious problems," and he had spoken to an attorney who would have Garcia deported. While Garcia waited to cross the street at 18th and Paulina, defendant grabbed her arm. The State noted that Miranda demonstrated the contact by grabbing her left arm above the elbow. Her "heart was beating very fast" and "strong," and she was scared. Garcia and her son crossed the street. Defendant followed and continued "screaming" at her.

¶ 8    Defendant stopped at the parking lot of a bank, screamed at Garcia to stop, and said that she wanted to leave their son "without a father." Garcia did not respond. Defendant said that he would "show you that your nephews are going to be without a father," and then made a phone call. Garcia did not remember defendant touching her in the parking lot, only him screaming at her and asking her to stop. Garcia entered the daycare and called the police.

¶ 9    Garcia further testified that on the night of February 22, 2016, she was at home with her sister-in-law, nephews, sister, son, and mother. Defendant arrived without invitation from Garcia, and Garcia's mother videotaped their interaction with her cell phone. The same video was played at defendant's burglary trial, during which Garcia also testified, and Garcia stated that the video accurately depicted the incident but that her mother was not videotaping the entire time defendant was present. Defense counsel stipulated to the video's foundation, and the State published it.

¶ 10    The video, which is in the record on appeal, depicts defendant in a kitchen with a white container in his hand and a television and other, smaller objects near his feet. He is speaking on a phone.[1] A woman appears to lightly push or place her hands on defendant, and he responds, "don't push me." Defendant starts to speak louder and more emphatically. A second woman tells defendant "don't speak to my mother," and repeatedly tells him to leave. Defendant says that he needs "a bag." He continues speaking louder and more emphatically into the phone while the person videotaping gives him a white garbage bag. The second woman helps defendant fill the bag with the items on the floor. Defendant picks up the television, and the second woman escorts him

---

[1] Some of the dialogue in the video, including defendant's conversation on the phone, is in Spanish and was not translated when it was published to the trial court.

out of the kitchen and down a stairway to the street. The door leading to the street at the bottom of the stairway is damaged.

¶ 11    On cross-examination, Garcia stated that defendant was upset in the video because their son was not wearing pajamas. Garcia admitted that, at some point following the birth of her and defendant's son, she was hospitalized for postpartum depression but could not remember for how long. Garcia was unable to care for their son while she was hospitalized.

¶ 12    In February 2016, defendant won the lottery. When defense counsel asked Garcia if she remembered defendant giving a vehicle to the mother of his three other children, Garcia stated that defendant claimed he sold her the vehicle. Garcia did not remember defendant giving the woman $5000 of his income tax refund. Garcia denied being upset with defendant for giving the vehicle and money to the woman, ending their relationship for that reason, or stopping him from seeing their son.

¶ 13    Garcia stated that on March 9, 2016, she had an order of protection against defendant and he was upset because she would not let him see their son. Defendant told Garcia that if she did not acquiesce, he would sue her, have her sent back to Mexico, and keep their son. Defendant also told Garcia he had hired a father's rights lawyer. When defendant grabbed Garcia's arm, he said he wanted to see their son and that he did not want anything to do with Garcia because she had cheated on him.

¶ 14    Garcia testified she had seen a video of her walking towards the intersection. Garcia denied that the video did not show defendant grabbing her. The parties stipulated to the video's foundation and defendant published it. The video is from a camera positioned above the sidewalk and pointed

towards the intersection of 18th and Paulina. The video is included in the record on appeal and does not have audio.

¶ 15    In the video, defendant backpedals in front of Garcia and their son while they walk away from the camera. Defendant then walks alongside them, speaking animatedly and gesturing closely at Garcia. Then, defendant steps in front of Garcia again, and sidesteps as she tries to go around him, blocking her path. Garcia keeps walking, and defendant steps towards her so she is briefly backed up against a storefront before he lets her continue, and walks beside her gesturing again. He again briefly cuts in front of her as they reach an intersection, and appears to reach out and grab Garcia as they pause momentarily at the intersection, although another person is briefly between them and the camera. Garcia and her son then cross the street, Garcia clearly hurrying as her son nearly jogs to keep up with her. Defendant follows closely as they cross the street and leave the camera's sight. Garcia identified in court the moment defendant grabbed her.

¶ 16    Garcia further testified that she did not complain to anyone as she walked down 18th because "[a]ll [she] wanted to do was run and keep [her] son safe" while defendant blocked her path. Garcia did not tell Miranda to call the police because she was scared. Garcia stated that she "was waiting for [Miranda] to help me, the way my face looked. And at the same time, I was embarrassed that [defendant] was screaming at me and everybody was watching." Garcia asked the daycare to call the police.

¶ 17    The State introduced a certified copy of defendant's 2009 misdemeanor conviction for domestic battery.[2]

---

[2]The State did not present evidence of the facts underlying the conviction that it had alleged in its motion to admit proof of other crimes and the pretrial hearing thereon, but the parties and the court agreed that it was only admissible as proof of the prior conviction alleged in the charging instrument.

¶ 18    Defendant moved for a directed finding, arguing the video showed that the contact between himself and Garcia was incidental. The court denied the motion.

¶ 19    Defendant testified that his son with Garcia was born in 2011. Defendant was his sole caretaker while Garcia suffered from postpartum depression for eight or nine months. Defendant also has three children with Leticia Gonzalez. Defendant won $13,000 in the lottery in February 2016, and gave $5000 to Gonzalez for their children. He also gave her a 2007 Jeep Compass truck. Defendant told Garcia what he gave Gonzalez, and they broke up around February 22, 2016, because Garcia no longer wanted to talk to defendant. Garcia would not let defendant see their son. Defendant had his sister text Garcia, but Garcia did not respond.

¶ 20    Defendant admitted that, on March 9, 2016, he approached Garcia on 18th Street. He stated that the video accurately depicted their interaction, but denied grabbing her arm or screaming at her. Defendant approached Garcia "to beg her to let [him] have [their son] on the weekends." Defendant wanted to take their son to church with him. Defendant denied threatening Garcia that his lawyer would have her deported, but told her that he had contacted "father rights" and wanted to see their son. On cross-examination, defendant stated he was not aware that Garcia had obtained an order of protection against him on February 23, 2016.

¶ 21    Following arguments, the trial court noted that Miranda "clearly" saw defendant grab Garcia and the video shows defendant aggressively approaching Garcia, "almost circling her" and gesturing. Thus, they did not appear to have a "civil conversation." The court found further that the video shows defendant pulling on Garcia's arm right before or at the time she started to cross the street, then aggressively following her across the street. While the video lacks audio, the court noted that defendant appeared to be "highly agitated." The court also noted that the video of the

February 22 incident again shows defendant "very highly agitated" and "screaming," so that the March 9 incident reflected a pattern of behavior by defendant towards Garcia. The court found that the videos elevated the case from a "he said/she said" scenario and made it "uncontestedly clear that this defendant is always in a highly agitated manner when he confronts this victim." Because of defendant's "pattern of aggressive and demeaning behavior towards [Garcia]," the court concluded that the contact was insulting or provoking even though Garcia was not injured. Accordingly, the court entered a finding of guilt.

¶ 22 Defendant filed a motion for a new trial or arrest of judgment, arguing in relevant part that the State failed to prove his guilt beyond a reasonable doubt. The court denied defendant's motion, and following a hearing, sentenced him to 2½ years' imprisonment.

¶ 23 Defendant appeals, arguing that the State failed to prove his guilt of domestic battery beyond a reasonable doubt because his contact with Garcia's arm was not knowingly insulting or provoking.

¶ 24 As an initial matter, the parties dispute the standard of review. Defendant contends we should review his claim *de novo*, while the State submits that we should review the sufficiency of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. Defendant correctly notes that questions of law are generally reviewed *de novo* (*Monson v. City of Danville*, 2018 IL 122486, ¶ 14), and challenges to the sufficiency of the evidence present a legal question (*Musacchio v. United States*, ___ U.S. ___, ___, 136 S. Ct. 709, 715 (2016)). However, the " 'legal' question" posed in such challenges is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see also *People v. Hardman*, 2017 IL 121453, ¶ 37 (same). Further, defendant testified at trial that he did not grab Garcia, while Garcia and Miranda testified that he did. He also argues on appeal that the State did not prove he acted knowingly, and "[k]nowledge is a question of fact for the trier of fact to decide" (*People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23). Accordingly, we will review defendant's claim under the sufficiency of the evidence standard. *Hardman*, 2017 IL 121453, ¶ 37.

¶ 25    Under that standard, reviewing courts draw all reasonable inferences from the evidence in favor of the prosecution and will not retry the defendant. *People v. Newton*, 2018 IL 122958, ¶ 24. We will not substitute our judgment for the trier of fact's when considering the weight of the evidence or the credibility of witnesses. *Hardman*, 2017 IL 121453, ¶ 37. It is not a reviewing court's duty to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks omitted). *Newton*, 2018 IL 122958, ¶ 24. A conviction will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 26    A person commits domestic battery if, by any means and without legal justification, he knowingly makes insulting or provoking physical contact with a family or household member. 720 ILCS 5/12-3.2(a)(2) (West 2016)). The offense is a Class 4 felony when, as here, a defendant has a prior conviction for domestic battery. 720 ILCS 5/12-3.2(b) (West 2016)). " 'Family or household members' include *** persons who have or allegedly have a child in common." 720 ILCS 5/12-0.1 (West Supp. 2015). Defendant does not contest that Garcia is a family or household

member, but only whether the State proved that he knowingly made insulting or provoking physical contact with her.

¶ 27    A person acts knowingly when he is "consciously aware" that his conduct is of the nature prohibited by the statute defining the offense or "is practically certain" to cause the prohibited result. 720 ILCS 5/4-5 (West 2016). Knowledge "may be proven by circumstantial evidence, and inferred from the defendant's action and the conduct surrounding it." *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 24. Knowledge may also be proven by evidence that a defendant acted intentionally, that is, with the conscious objective or purpose to accomplish the result described in the statute defining the offense. 720 ILCS 5/4-4, 4-5 (West 2016).

¶ 28    Defendant submits that our courts have not explicitly defined the term "insulting or provoking," but "[t]he words 'insulting' and 'provoking' are commonly used words that are neither vague nor difficult for the average person to define." *People v. Taher*, 329 Ill. App. 3d 1007, 1016 (2002). When considering whether contact was insulting or provoking, a "trier of fact may take into account the context in which a defendant's contact occurred." *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 49. "In other words, what may be an innocent touching in one instance, may be interpreted quite differently in a different set of circumstances." *People v. d'Avis*, 250 Ill. App. 3d 649, 651 (1993); see *People v. DeRosario*, 397 Ill. App. 3d 332, 332-34 (2009) (contact was insulting or provoking when the defendant, who was stalking the victim after a failed relationship, sat behind her and his knees touched her back and hip). The trier of fact can infer from a victim's reaction at the time of the contact that the victim was insulted or provoked even if the victim does not testify as such. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55; see *People v. Dunker*,

217 Ill. App. 3d 410, 415 (1991) (sufficient evidence that contact was insulting or provoking when defendant poked victim's chest and victim left crying and shocked).

¶ 29    At trial, Garcia testified that defendant approached her and her son as she exited a bus and followed and screamed at her as she walked her son to daycare. Defendant repeated that he had spoken to a lawyer who would have her deported. Defendant grabbed her arm at the intersection, scaring her and causing her heart to beat fast and strong. Garcia asked the daycare to call the police. Miranda corroborated that defendant grabbed Garcia's arm and thought Garcia may have been in trouble. The video of the incident tracks Garcia's and Miranda's testimony and shows defendant repeatedly cutting in front of Garcia while she and her son attempt to walk towards the intersection. After he grabs her at the intersection, the video shows Garcia crossing the street so quickly that her son is nearly jogging to keep pace, while defendant follows them closely.

¶ 30    Less than a month before the incident giving rise to this case, defendant entered and took items from Garcia's home without permission. Following that incident, Garcia had sought and procured a protective order against him.

¶ 31    Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find that defendant knowingly made insulting or provoking contact with Garcia. While grabbing a person's arm may be innocuous in other circumstances, defendant was convicted of theft following an incident in Garcia's home just weeks earlier, accosted her in public while she was taking their son to daycare, and grabbed her arm after cutting her off and screaming at her. As the trial court noted, the contact therefore fell into "a pattern of aggressive and demeaning behavior towards the victim." A factfinder could infer from Garcia's reaction that the contact was insulting or provoking: Garcia attempted to ignore defendant and keep walking, was scared to ask Miranda

to call the police but hoped Miranda would help her, and, after defendant grabbed her arm, hurried across the street. Although Garcia did not ask Miranda to call the police, she testified that she was scared, embarrassed, and did not complain to anyone while walking toward the intersection because "[a]ll [she] wanted to do was run and keep [her] son safe." When she arrived at the daycare she asked them to call the police. See *Wrencher*, 2011 IL App (4th) 080619, ¶ 55 (trier of fact may infer from victim's contemporaneous reaction that contact was insulting or provoking even if victim does not testify she was insulted or provoked); *Dunker*, 217 Ill. App. 3d at 415 (defendant made insulting or provoking contact by poking son's teacher in chest when teacher left crying, shocked, and feeling contact "was uncalled for").

¶ 32     Further, we find defendant's attempt to distinguish his case from *DeRosario* unpersuasive. In *DeRosario*, the defendant sat behind the victim in a smoking lounge and his knees touched the victim's back and hip. *DeRosario*, 397 Ill. App. 3d at 332-33. The defendant had been following the victim after a failed relationship, to the point the victim had filed a police report against him, although it is unclear whether the defendant knew that. *Id.* There were many other places in the lounge the defendant could have sat. *Id.* at 333. The victim "soon got up and called the police." *Id.* The contact made the victim feel "scared, uncomfortable, trapped, and mad." (Internal quotation marks omitted.) *Id.* The trial court found that the defendant knowingly made insulting or provoking contact, and we affirmed. *Id.* at 334.

¶ 33     To distinguish *DeRosario*, defendant argues that, by touching the victim's hip and small of her back, the defendant's conduct implied sexual undertones absent in this case. However, the *DeRosario* court made no mention of such undertones; it held that "the trial court reasonably concluded that defendant intentionally sat where he was bound to come in contact with the victim

and that he knew that this conduct would provoke her." *Id.* Likewise, the physical contact here also occurred in the context of a failing relationship. Garcia had sought an order of protection against defendant based on his prior behavior towards her. While defendant denied knowing about the protective order, he acknowledged that Garcia did not want contact with him and that, after she began ignoring him, he requested his sister contact Garcia on his behalf and Garcia never responded. The video shows him repeatedly stepping in front of her to block her path. He yelled at her in public. Even though Miranda was wearing earplugs, she could tell "something was going on" and believed Garcia may have been "in trouble." Like the victim in *DeRosario*, the contact prompted Garcia to call the police.

¶ 34   As in *DeRosario*, while the physical contact may have been innocuous in other circumstances, we conclude that defendant made insulting or provoking contact with Garcia. Also as in *DeRosario*, we conclude that a factfinder could infer from the above evidence that defendant did so knowingly, given that he knew Garcia did not want to see him and, as the trial court noted, had exhibited a pattern of aggressive behavior towards her—both in a prior instance and in this public instance where he yelled at her and repeatedly tried to stop her from walking her son to daycare before grabbing her arm. See *Jackson*, 2017 IL App (1st) 142879, ¶ 24 (trier of fact can infer that defendant acted knowingly from act and conduct surrounding act); *DeRosario*, 397 Ill. App. 3d at 334 ("defendant intentionally sat where he was bound to come in contact with the victim and *** knew that this conduct would provoke her").

¶ 35   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36   Affirmed.